# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 10-CR-74/12-CR-293 (JFB)
_____

UNITED STATES OF AMERICA,

VERSUS

HERIBERTO MARTINEZ, ALSO KNOWN AS "BOXER," AND
CARLOS ORTEGA, ALSO KNOWN AS "SILENCIO" OR "SILENT",

Defendants.

_____

## MEMORANDUM AND ORDER
October 24, 2013

_____

JOSEPH F. BIANCO, District Judge:

On March 21, 2013, defendants Heriberto Martinez ("Martinez") and Carlos Ortega ("Ortega") (collectively, "defendants") were convicted, after a jury trial, of all counts with which they were charged pursuant to a 27 defendant, 70-count superseding indictment filed on March 3, 2011 in *United States v. Prado*, No. 10-CR-074 (JFB). The charges of which the defendants were found guilty stem from their involvement in the La Mara Salvatrucha ("MS-13") street gang, a criminal enterprise based in El Salvador and operating in the United States, including on Long Island.

Specifically, the jury delivered a verdict finding Martinez guilty on all fourteen counts with which he was charged: (1) racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963 (Count One); (2) racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963 (Count Two); (3) conspiracy to murder Vanessa Argueta ("Argueta"), in violation of 18 U.S.C. § 1959(a)(5) (Count Three); (4) murder of Argueta, in violation of 18 U.S.C. §§ 1959(a)(1) and (2) (Count Four); (5) discharge of a firearm in connection with the murder of Argueta, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 2 (Count Five); (6) causing the death of Argueta through the use of a firearm, in violation of 18 U.S.C. §§ 924(j)(1) and 2 (Count Six); (7) accessory after the fact in connection with the murders of Argueta and Diego Torres ("Torres"), in violation of 18 U.S.C. § 3 (Count Seven); (8) conspiracy to murder Nester Moreno ("Moreno"), in violation of 18 U.S.C. § 1959(a)(5) (Count Fifteen); (9) murder of Moreno, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Sixteen); (10) discharge of a firearm in connection with the murder of Moreno, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C) and 2 (Count

Seventeen); (11) causing the death of Moreno through the use of a firearm, in violation of 18 U.S.C. §§ 924(j)(1) and 2 (Count Eighteen); (12) conspiracy to murder Mario Alberto Canton Quijada ("Quijada"), in violation of 18 U.S.C. § 1959(a)(5) (Count Nineteen); (13) murder of Quijada, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Twenty); and (14) brandishing a firearm during the murder of Quijada, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(C) and 2 (Count Twenty-One). The jury's verdict also found Ortega guilty on all twelve counts with which he was charged: (1) racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963 (Count One); (2) racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963 (Count Two); (3) conspiracy to murder David Sandler ("Sandler"), in violation of 18 U.S.C. § 1959(a)(5) (Count Eight); (4) murder of Sandler, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Nine); (5) discharge of a firearm in connection with the murder of Sandler, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 2 (Count Ten); (6) causing the death of Sandler through the use of a firearm, in violation of 18 U.S.C. §§ 924(j)(1) and 2 (Count Eleven): (7) attempted murder of Aaron Galan ("Galan"), in violation of 18 U.S.C. §§ 1959(a)(5) and 2 (Count Twelve); (8) assault with a dangerous weapon, in violation of 18 U.S.C. §§ 1959(a)(3) and 2 (Count Thirteen): (9) discharge of a firearm in connection with the attempted murder and assault of Galan, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C) and 2 (Count Fourteen); (10) conspiracy to murder Quijada, in violation of 18 U.S.C. § 1959(a)(5) (Count Nineteen); (11) murder of Quijada, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Count Twenty); and (12) brandishing a firearm during the murder of Quijada, in violation of 18 U.S.C.

§§ 924(c)(1)(A)(ii), 924(c)(1)(C) and 2 (Count Twenty-One).

On June 27, 2013, Ortega renewed his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 that was previously made at trial and denied by the Court. (Tr. 3061.) Ortega also moved, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). On June 28, 2013, Martinez also renewed his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 that was previously made at trial and denied by the Court. (*Id.*) In moving for a judgment of acquittal, defendants argue that the evidence presented at trial was insufficient to convict them of the various predicate acts – acts alleged to have been performed in connection with the MS-13 racketeering enterprise and for the purpose of increasing or maintaining their position in that enterprise – with which they were charged.

Specifically, Martinez argues that the government failed to establish that any of the murders or conspiracies to murder with which he was charged were (1) sufficiently related to the MS-13 enterprise to qualify as predicate acts under the Racketeer Influenced and Corrupt Organization Act ("RICO"), and (2) motivated by a desire to increase or maintain his position in the MS-13, as required under the Violent Crimes in Aid of Racketeering ("VICAR") statute. Said another way, Martinez argues that the evidence presented at trial did not demonstrate a sufficient nexus between any of the predicate acts with which he was charged and the MS-13 enterprise's threat of criminal activity, and that he participated in those acts because he was seeking to maintain or increase his status in the MS-13. Ortega's motion focuses exclusively on the Quijada murder, arguing that the evidence

presented at trial was insufficient to establish that Ortega (1) conspired to murder Quijada; (2) knowingly and intentionally murdered Quijada; and (3) aided and abetted the use of a firearm during the commission of Quijada's murder. Like Martinez, Ortega also challenges the government's showings that Quijada's murder was related to the MS-13 and that Ortega's participation was motivated by a desire to maintain or increase his position in the gang. Moreover, Ortega argues that the weakness of the witness testimony and evidence presented in regard to his involvement in the conspiracy to murder and murder of Quijada warrants a new trial.

For the reasons set forth below, the Court denies defendants' motions for a judgment of acquittal and the motion for a new trial in their entirety.

## I. STANDARD OF REVIEW

### A. Motion for Judgment of Acquittal

Motions under Rule 29(c) are governed by the same standard as motions under Rule 29(a). Pursuant to Rule 29(a), a district court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Rule 29(c) permits a defendant to "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c). However, as set forth below, "'[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient.'" *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004)); *accord United States v. Pipola*, 83 F.3d 556, 564 (2d Cir. 1996) (citing *Glasser v. United*

*States*, 315 U.S. 60, 80 (1942)); *see also United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990) (stating that motions to challenge sufficiency of evidence "rarely carry the day").

The standard under Rule 29, as articulated by the United States Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979); *accord United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *Lorenzo*, 534 F.3d at 159; *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006); *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006). In other words, "'[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Temple*, 447 F.3d at 136 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).

It is important to emphasize that, in evaluating the evidence under this standard, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *see also United States v. Florez*, 447 F.3d 145, 154-55 (2d Cir. 2006) ("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."); *Guadagna*, 183 F.3d at 130 (holding that a court must bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the

evidence and the reasonable inferences to be drawn for that of the jury" (citations and internal quotation marks omitted)).

Therefore, viewing the evidence in the light most favorable to the government means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999) (citation and internal quotation marks omitted); *accord United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000) ("[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own." (citation and internal quotation marks omitted)). In examining the sufficiency of the evidence, the Court also should not analyze pieces of evidence in isolation, but rather must consider the evidence in its totality. *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993); *see also Guadagna*, 183 F.3d at 130 (holding that sufficiency test must be applied "to the totality of the government's case and not to each element, as each fact may gain color from others"). Finally, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" *Lorenzo*, 534 F.3d at 159 (quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)); *see also Irving*, 452 F.3d at 117 ("A jury may convict on circumstantial evidence alone."); *accord Jackson*, 335 F.3d at 180; *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must

necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (citation and internal quotation marks omitted); *accord United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005).

In short, "'[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Temple*, 447 F.3d at 137 (alteration in original) (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)) (internal quotation marks omitted). On the other hand, "'in passing upon a motion for directed verdict of acquittal, . . . if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted.'" *Id.* (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

B. Motion for a New Trial

Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion only in "extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009), and only if there exists "'a real concern that an innocent person may have been convicted.'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d. Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict

stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134.

## II. DISCUSSION

### A. Martinez's Motion

In moving for a judgment of acquittal, Martinez argues that the evidence presented at trial was insufficient to prove that any of the predicate acts with which he was charged were performed in furtherance of the MS-13 enterprise. (*See* Martinez Mot. at 2.) Instead, Martinez argues that the testimony adduced at trial "supports the conclusion that each of [the three] murders [with which he was charged] was committed for personal reasons and that none actually related to the MS-13 enterprise." (*Id.* at 4.) In addition, Martinez argues that the government failed to prove that his participation in each of the three murders was motivated by a desire to maintain or further his position in the MS-13. (*Id.* at 5.) As discussed in detail below, because the testimony and evidence presented at trial was sufficient to establish that (1) the three murders with which Martinez was charged were related to the MS-13 racketeering enterprise, and (2) Martinez's participation in each of those murders was motivated by a desire to elevate or maintain his status in the MS-13, Martinez's motion for a judgment of acquittal is denied in its entirety.

### 1. Applicable Law

#### a. The RICO Statute

The RICO provisions under which Martinez was convicted makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," 18 U.S.C.

§ 1962(c), and to "conspire to violate" the substantive provisions of RICO, *id.* § 1962(d). To establish a "pattern of racketeering activity," the statute requires "at least two acts of racketeering activity . . . the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." *Id.* § 1961(5). However, the mere commission of two racketeering acts in furtherance of the RICO enterprise is not alone sufficient to establish the requisite pattern of racketeering activity. "Rather, 'a RICO pattern may not be established without some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity.'" *United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012) (quoting *United States v. Indelicato*, 865 F.2d 1370, 1381 (2d Cir. 1989)); *see also United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010) ("[C]onduct forms a pattern under RICO when it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." (citation and internal quotation marks omitted)). Thus, the predicate acts must be related to one another ("horizontal relatedness") and they must have a nexus to the enterprise ("vertical relatedness"). *Cain*, 671 F.3d at 284. "The requirements of relatedness and continuity protect defendants from RICO charges based on isolated or sporadic criminal acts." *Burden*, 600 F.3d at 216. With respect to the specific requirement that there be a relationship between the predicate acts and the criminal enterprise ("vertical relatedness"), the Second Circuit has explained that "[t]hat relationship is satisfied if the offense was related to the enterprise's activities, whether or not it was in furtherance of those activities, or if the

defendant was enabled to commit the offense solely by virtue of his position in the enterprise." *United States v. Thai*, 29 F.3d 785, 815 (2d Cir. 1994).

### b. The VICAR Statute

The VICAR statute provides, in relevant part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . .

18 U.S.C. § 1959(a). To show that a defendant acted for the purpose of maintaining or increasing position in an enterprise engaged in racketeering activity, the prosecution must show that (1) the defendant "had a position in the enterprise," and (2) his "general purpose" in murdering, attempting, or conspiring to murder an individual "was to maintain or increase his position" in the enterprise. *United States v. Whitten*, 610 F.3d 168, 178 (2d Cir. 2010) (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)) (quotation marks omitted). "Maintaining or increasing position in the racketeering enterprise need not have been defendant's sole or principal motive." *Id.* (alterations omitted). Instead, the motive element is satisfied "'if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of

his membership in the enterprise or that he committed it in furtherance of that membership.'" *Id.* at 179 (quoting *Concepcion*, 983 F.2d at 381); *see also United States v. Farmer*, 583 F.3d 131, 143-44 (2d Cir. 2009) ("The government was not required to prove that [the defendant's] sole or principal motive was maintaining or increasing his position, so long as it proved that enhancement of status was among his purposes." (internal citation and quotation marks omitted)). Accordingly, the Second Circuit has affirmed convictions under the VICAR statute for "violent crimes committed or sanctioned by high ranking leaders of the enterprise for the purpose of protecting the enterprise's operation and furthering its objectives" or where "the defendant, as a leader within the enterprise, was expected to act based on the threat posed to the enterprise and that failure to do so would have undermined his position within that enterprise." *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001).

### 2. Analysis

Martinez does not challenge the sufficiency of the government's evidence with respect to his involvement in the three crimes with which he was charged and convicted. However, Martinez challenges the government's showings of the requisite relatedness under RICO and motivation under VICAR with respect to each of the three murders. The Court notes, once again, that a defendant challenging a conviction on the basis of insufficient evidence bears a heavy burden. *United States v. Thomas*, 377 F.3d 232, 237 (2d Cir. 2004). The court must view the evidence in the light most favorable to the government and draw all permissible inferences in the government's favor. *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006).

Martinez contends that the requisite nexus between the predicate acts with which he was charged and the MS-13 enterprise was not established at trial, thereby preventing the government from proving a pattern of racketeering activity to sustain his conviction under the RICO statute. The Court analyzes the testimony and evidence presented on the issue of vertical relatedness in the context of each of the three murders in turn below and, for the reasons discussed *infra*, concludes that the government clearly established the requisite nexus between each of those murders and the MS-13 racketeering enterprise.

Martinez also contends that the evidence and testimony presented at trial were insufficient to support a jury finding that he had acted with any of the motives required for conviction under the VICAR statute – namely, that his participation in each of the three murders was motivated by a desire to maintain or increase his position within the MS-13. However, as discussed in detail below, extremely strong evidence and testimony was presented at trial to establish that Martinez participated in each of the three murders to maintain or increase his status and position within the MS-13.

a. The Murder of Moreno

The charges brought against Martinez related to the death of Moreno arise from a shooting that took place at the El Rancho Bar & Grill in Hempstead, New York on March 6, 2010.

i. Summary of the Murder

Prior to the date of Moreno's murder, on February 20, 2010, Martinez and three other members of the MS-13 (Gasparin, Pollo, and Guanaco)[1] went to the El Rancho Bar & Grill. (Tr. 1184-87.) The group did not have money to pay their bill at the bar, so they decided to leave without paying for their drinks. (Tr. 1135-36, 1188.) However, upon exiting the bar, Gasparin was stopped by Moreno, a bouncer at the bar. Moreno refused to let Gasparin leave the bar without paying the group's bill. (Tr. 1136, 1188.) Martinez and the other MS-13 members yelled at Moreno, telling him to let Gasparin go. At that point, Moreno pushed Gasparin to the ground. (Tr. 1189.) Martinez responded by threatening Moreno with a glass bottle that he was waving in the air. (*Id.*) As a result, Moreno took out pepper-spray and sprayed Martinez in the face. (*Id.*) Moreno then released Gasparin, who helped Martinez to his feet. (Tr. 1190.) The group then left the bar, telling Moreno that they belonged to the Mara and would be back, and that that "this [won't] end here." (Tr. 1191; *see also* Tr. 1136.)

Martinez, Gasparin, and two other members of the MS-13 (Demente and Carlito) returned to the El Rancho Bar & Grill on March 6, 2010. (Tr. 1197-98, 1741.) The plan that developed was for Gasparin to identify Moreno (as he had been there the night Moreno sprayed Martinez with pepper spray), Carlito to open the door to the bar, and Demente to shoot Moreno. (Tr. 1197-98, 1742-43.) Martinez waited behind because he would be recognized at the bar if

---

[1] For purposes of this Memorandum and Order, the Court refers to the defendants by their last names, rather than by their gang names ("Boxer" for Martinez and "Silencio" or "Silent" for Ortega). In addition, when referencing the trial testimony of MS-13 members (cooperating witnesses), the Court refers to those witnesses by their last names, rather than by their gang names. However, when summarizing the murders, the Court refers to other individuals involved by their gang names, as those are the names provided by the witnesses who testified to the murders at trial.

he went in, due to the incident that had occurred with the pepper spray. (Tr. 1199.)

After leaving the bar, Gasparin, Carlito, and Demente contacted Martinez to advise him that there were too many people in front of the bar to shoot Moreno. (Tr. 1200; 1743-44.) Martinez told them to return to the bar and finish the job. (Tr. 1200; 1744.) The three men then returned to the bar. Gasparin and Carlito opened the door to the bar and Demente proceeded to shoot Moreno in the middle of his forehead with a .22 caliber gun. (Tr. 1202-03; *see also* 1088-89.) Carlito dropped Gasparin's cell phone as the three men were fleeing the scene to the car where Martinez was waiting. (Tr. 1204.) Gasparin picked up his phone, but left behind the battery and the battery cover, which were later recovered by crime scene detectives. (Tr. 1205-06; Gov't Exs. 331B, 332B.) After the three men jumped into the car, the group sped off screaming "La Mara, La Mara!," "nobody messes with the Mara," "nobody will beat us," and "that was done for La Mara Salvatrucha." (Tr. 1206-07, 1748.)

ii. Vertical Relatedness under RICO

Sufficient evidence at trial – in the form of witness testimony – demonstrated that the racketeering acts of murder and conspiracy to murder Moreno were "related to the activities of [the RICO] enterprise." *United States v. Jones*, 296 F. App'x 179, 181 (2d Cir. 2008).

First, in regards to the February 20th pepper spray incident, the government presented evidence that demonstrated that Martinez and members of the MS-13 felt that Moreno had disrespected the MS-13 that evening. Santos Joel Calderon ("Calderon") (also known as "Gasparin") testified that, before leaving the bar after

Martinez had been pepper sprayed, they "were all saying that [they] belonged to the Mara, and Boxer was saying that this wouldn't end here." (Tr. 1191.) Calderon testified that the group meant to "let[] [Moreno] know that [they] belong to the Mara, to the gang, and that they should not mess with [them]." (*Id.*) Calderon further testified that, upon returning to Far Rockaway following the pepper spray incident, Martinez told him, in regards to the incident, that "it wouldn't end there and that nobody should mess with the Mara." (Tr. 1193.)

Second, the government's evidence at trial demonstrated that the plan for Moreno's murder was developed and carried out in a similar manner to other MS-13 murders, and that those involved felt as though the gang had been vindicated by Moreno's murder. With respect to the events leading up to the March 6, 2010 murder, Calderon testified that Martinez voiced a desire to "go and kill the security guard" that had sprayed him a few weeks earlier, and that he collected MS-13 members to carry out the murder (Tr. 1197), as well as an MS-13 weapon to use in commission of the murder (Tr. 1196-97). Both Calderon and Carlos Martinez ("C. Martinez") (also known as "Carlito") also testified about how the plan for Moreno's death was developed that evening. As is customary for MS-13 murders, the leader present, here, Martinez, gave the orders for how the murder would be carried out. (Tr. 1201, 1741.) Both Calderon and C. Martinez testified about the sentiment of the group and their verbal expressions in the aftermath of the murder. Calderon testified that, after fleeing the scene of the crime, they were all saying "La Mara. La Mara. And also the Coronados and the Surenos will be together forever. And nobody will beat us. And nobody messes with the Mara. . . . La Mara! La Mara! La Mara!" (Tr. 1206.) When asked

how they were saying those things, Calderon responded that they were all "*screaming* La Mara inside of the car." (*Id.* (emphasis added).) While in the car, the men also remarked on the fact that, by killing Moreno, they "fed the beast" (Tr. 1207), a phrase (referring to the devil) that MS-13 members habitually used to denote murders done in service of the gang. C. Martinez similarly testified that, following the shooting, the group of men involved "were all happy and [they] were all saying that that was done for La Mara Salvatrucha and that the beast had eaten it up." (Tr. 1748.) Calderon also testified that, after the murder, Martinez told him that Demente was a "good soldier" for having shot Moreno, meaning that "he was a good gang member for the MS-13." (Tr. 1219.)

All of this evidence presented by the government was sufficient to allow the jury to conclude that the conspiracy to murder and the murder of Moreno was driven by a need to punish anyone who disrespected members of the MS-13 (in this case, that Moreno took issue with the fact that MS-13 members were leaving the bar without paying their bill, and that he pushed Calderon and pepper sprayed Martinez as a result). Thus, the government's evidence with respect to the Moreno murder overwhelmingly satisfied the vertical relatedness requirement of RICO – namely, that there be a nexus between the racketeering act and the racketeering enterprise – and Martinez's motion is, therefore, denied on this ground.

iii. Motivation under VICAR

The evidence presented by the government at trial was also more than sufficient to support a finding by the jury that Martinez's participation in both the conspiracy to murder and the murder of

Moreno was motivated by a desire to maintain or increase his position in the MS-13.

As a preliminary matter, there was ample evidence demonstrating that Martinez held a "position" within the enterprise. *Whitten*, 610 F.2d at 178. Various witnesses at trial testified about the different cliques within the MS-13 – delineated groups of MS-13 members that control specific geographic areas. (*See, e.g.*, Tr. 327 ("A clique is like a group of people who have an area. And they . . . call the shots in that area.").) Multiple witnesses at trial testified that Martinez was a *leader* of the CLS clique of the MS-13, a group of MS-13 members based in Brentwood, New York. (*See, e.g.*, Tr. 1183-84.) According to the testimony of Jimmy Sosa ("Sosa"), one becomes a leader of a clique by doing a number of things to earn respect in the gang. (Tr. 345.) Calderon explicitly testified that it was important for him to know that Martinez's position within the gang was that of a clique leader, for members are required "to follow what the leader say[s]." (Tr. 1184.) Accordingly, because of his position, Martinez was the one "in charge" of the plans for Moreno's murder. (Tr. 1201.)

Having concluded that the evidence was sufficient to establish that Martinez had a position in the MS-13, the next inquiry is whether Martinez participated in the murder of Moreno for the purpose of "maintaining or increasing" that position in the gang. Calderon testified that it was Martinez who decided that they would kill Moreno, and that it was Martinez who was in charge of developing the plan for Moreno's murder. (Tr. 1197; Tr. 1201.) Calderon also testified that this desire to kill Moreno developed after the February 20th incident, when Moreno reprimanded the MS-13 members for leaving the bar without paying their bill

and pepper sprayed Martinez (Tr. 1192-97), and Martinez felt as though the gang had been "mess[ed]" with (Tr. 1193). Based on this evidence, a rational jury could have concluded that Martinez, as a leader within the MS-13, felt compelled to plan Moreno's murder after Moreno had disrespected him and "implicitly threatened [his] position within the enterprise and perhaps the reputation of the enterprise itself." *United States v. Santiago*, 207 F. Supp. 2d 129, 156 (S.D.N.Y. 2002).

Even if Martinez were motivated primarily or in part by a desire for personal revenge, the fact that he viewed Moreno's actions as an affront to the gang (*see* Tr. 1191-93), and enlisted fellow MS-13 members to carry out the murder of Moreno (*see* Tr. 1197), demonstrates that he was acting, at least in part, for the gang "in furthering its policies of retaliatory violence against any who sufficiently antagonized any of its members, and in order to maintain his position in it." *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996); *see also United States v. Rivera*, 273 F. App'x 55, 58 (2d Cir. 2008) ("The Government presented evidence that [the defendant's] motives for the murders were not only based on self-preservation, but also on preservation of the enterprise."); *James*, 239 F.3d at 124 n.5 ("With respect to defendant's contention that [the] murder was an act of personal revenge and was not done in aid of defendant's racketeering enterprise, we agree with the district court that 'one of the motivations for this murder was tied to the association with the enterprise and the desire to maintain standing, if you will, in that . . . . for lack of a better way of putting it, community.' . . . [W]e conclude that a jury could find that [the] murder was not only an act of personal revenge, but was, also, tied to [defendant's] racketeering activities . . . ." (alterations omitted)). Moreover, following

the murder, Martinez was involved in the chanting of "La Mara! La Mara! La Mara!" (Tr. 1206), and, according to the testimony of C. Martinez, Martinez made a couple of phone calls to let other members of the gang know that "the problem . . . with the security guard had been fixed" (Tr. 1748-49). Martinez's actions after the murder also demonstrate that he was proud of the crime and wanted others within the gang to be made aware of it. *See Whitten*, 610 F.3d at 180 (citing evidence indicating that the defendant was "proud" of his crimes and "wanted others to be made aware of them" to support a finding that the evidence presented on the "maintaining or increasing position" element of the VICAR statute was sufficient).

Thus, based on all of this evidence presented at trial, a rational jury could find, beyond a reasonable doubt, that at least one of Martinez's motivations in conspiring to murder and participating in the murder of Moreno was to maintain or increase his position in the MS-13 enterprise. Accordingly, Martinez's motion is denied on this ground as well.

b. The Murder of Quijada

The charges related to Quijada's death pertain to the events that took place on a beach in Far Rockaway on March 16, 2010.

i. Summary of the Murder

On the evening of March 16, 2010, a group of MS-13 members (including Martinez and Ortega) met at Payaso's house to discuss what was going on in the SLS clique of the MS-13. (Tr. 1220-22.) A central topic of conversation was Quijada, also known as Baby Blue – namely, the fact that he "wasn't running properly," "was no good for the Mara because he only caused

problems," and "only caused problems and never solved a thing." (Tr. 1223-24.) Because of Quijada's behavior, it was decided that there would be a "mis[i]on," or mission. During this mission, Quijada was going to be required to kill someone from a rival gang to prove himself to the MS-13. (Tr. 1224; *see also* Tr. 1762 (C. Martinez testifying that Quijada was given one more chance, and that if he did not take advantage of that one chance, he would be killed); Tr. 1770 (C. Martinez testifying that Smokey, a leader of the Surenos clique, told him that Quijada should be given a chance, and that "if [Quijada] didn't want to pick up the gun and he didn't want to commit the crime, then he should be killed right then and there").) However, when Quijada was taken out on his mission, he did not kill any rival gang members. (Tr. 1225.)

After the mission, the group of MS-13 members (including Martinez and Ortega) returned to Payaso's house to discuss the Quijada situation. C. Martinez testified that, at this meeting, Ortega told the group that when he tried to give Quijada a gun during the mission, Quijada did not want to pick it up. (Tr. 1776.) C. Martinez also testified that Ortega told the group that they had to kill Quijada, and that Martinez agreed with Ortega, explaining that if Quijada were ever picked up by the police, he would likely "snitch" on the MS-13. (*Id.*) The MS-13 members at Payaso's house at the time were generally "saying that [Quijada] was no good and that he had to be eliminated." (Tr. 1226.) Calderon testified that what the men meant was that Quijada had to be killed because "he only brought or caused problems and that he was not there to help the Mara," and that "people like that should not be in the Mara." (Tr. 1227.) A vote was taken of everyone in attendance, which resulted in a unanimous decision to pick Quijada up and kill him. (*Id.*; Tr. 1776.)

Martinez and Ortega were a part of the group that left to pick up Quijada. (Tr. 1227; Tr. 1776.)

After the decision was made to kill Quijada, Little Lonely, an MS-13 member, called Quijada to tell him that they were going to pick him up because they had found rival gang members for him to kill. (Tr. 1776-77.) Martinez, Ortega, Little Lonely, Payaso, and Michichi then left Payaso's apartment to pick up Quijada. (Tr. 1777.)

Later that night, Ortega called Demente to report that some of the men had been arrested (one of them being Martinez) and that he and Payaso were in hiding. (Tr. 1779.) C. Martinez called Smokey to tell him that Quijada had been killed. (Tr. 1780.) At some point after 3:00 a.m., Ortega and Payaso returned to Payaso's house to meet C. Martinez and the others. They were "scared, dirty, full of sand and wet." (Tr. 1237-38.) Payaso then proceeded to tell Calderon the story of how Quijada was murdered (Tr. 1240), and, at trial, Calderon testified to the following course of events.

Quijada was taken to a beach in Far Rockaway. Payaso told Quijada to turn around, at which point Payaso pointed a gun at Quijada's head. Payaso tried to pull the trigger of the gun, but it got stuck. Quijada then started to run; the group chased him down. Payaso grabbed a machete from Martinez and used it to stab Quijada numerous times. Martinez left the scene with Little Lonely, ahead of Payaso and Ortego. Martinez and Little Lonely were met by the police. When Ortega and Payaso realized that the police had stopped Martinez and Little Lonely, they ran down to the beach, into the water, and hid in a wooded area until they were able to leave the scene. (Tr. 1239-1242.) Police officers testified that they found Quijada's body covered with stab

wounds, as well as the blade of a kitchen knife, a switchblade knife, and a silver .22 caliber firearm on the beach. They also testified to finding a machete in the water and a wood handle of a kitchen knife in the nearby parking lot. (Tr. 1995, 2113, 2173, 2176-77.)

## ii. Vertical Relatedness under RICO

The evidence at trial overwhelming demonstrated that the racketeering acts of murder and conspiracy to murder Quijada were related to the activities of the MS-13.

First, both Calderon and C. Martinez testified that the decision to murder Quijada was made at a meeting between members of the MS-13. Both witnesses testified that a vote was taken of the MS-13 members in attendance, and it was unanimously determined that Quijada should be killed. (Tr. 1227; Tr. 1776.) Thus, the evidence at trial demonstrated that the plan for Quijada's murder was born out of an MS-13 conference. Second, both witnesses testified that the official decision to murder Quijada was made after Quijada failed to pick up the gun he was given to kill a rival gang member – a task that is expected of any MS-13 member. (Tr. 1225; Tr. 1776; *see also* Tr. 330 (explaining that killing rival gang members constitutes "putting in work" for the gang).) Quijada was given one last chance to prove himself to the MS-13, by killing a chavala, a rival gang member, but he failed to do so. (Tr. 1225.) As a result, it was decided that Quijada would have to pay, in the form of his own death, for his failure to perform for his gang. (Tr. 1226-27.) Finally, Calderon repeatedly testified that the decision to murder Quijada was based on an assessment of Quijada's failure to live up to the ideals of the MS-13. Specifically, Calderon indicated that Quijada "only brought or caused problems and that he was

not there to help the Mara" (Tr. 1227), "was no good for the Mara" (Tr. 1224), and "wasn't running properly" (Tr. 1223). Because "people like that should not be in the Mara" (Tr. 1227), it was determined that Quijada should be killed. Thus, according to Calderon's trial testimony, Quijada's murder was related to his failure to follow the rules and participate in the activities of the gang. *See Thai*, 29 F.3d at 815 (explaining that the relationship requirement under RICO is satisfied if the offense was "related to the enterprise's activities, whether or not it was in furtherance of those activities").

Based on all of this evidence, and viewing it in the light most favorable to the government, a rational jury could undoubtedly conclude that the conspiracy to murder and the murder of Quijada were related to the need to punish members of the MS-13 who failed to follow the rules and embody the ideals of the gang. The government's evidence was, therefore, more than sufficient to support the conclusion that the conspiracy to murder and the murder of Quijada were related to the affairs of the MS-13. Thus, because the government's evidence at trial established the requisite nexus between the racketeering acts pertaining to Quijada and the racketeering enterprise, Martinez's motion is denied on this ground.

## iii. Motivation under VICAR

In arguing that his participation in the Quijada murder was not motivated by the requisite desire to maintain or increase position in the criminal enterprise, Martinez argues that, because the killing was not "officially sanctioned," thereby subjecting the killers to potentially becoming "targeted for murder themselves," the murder of Quijada "diminished" Martinez's standing in the MS-13. (Martinez Mot. at 5.) This

argument pertaining to a reduction in status is unavailing, for the VICAR inquiry is not how a defendant's position in the enterprise was *actually affected* by virtue of his involvement in the crime, but is instead what the defendant's purpose was, with respect to his position, in engaging in the criminal activity in the first instance. *See Farmer*, 583 F.3d at 142 ("[T]he question is not whether [the defendant's] position in the [enterprise] was advanced in fact by the murder he committed, but whether his purpose in committing the murder was to benefit his position.").

Here, there was ample evidence from which a rational jury could conclude that Martinez's participation in the Quijada murder was motivated by a desire to maintain or increase his position in the MS-13. As discussed *supra*, sufficient evidence at trial demonstrated that Martinez held a position in the enterprise (as a leader of the CLS clique of the MS-13). Multiple witnesses at trial testified about how members of the MS-13 were expected to help the gang. For example, members of the MS-13 are supposed to seek out and kill chavalas. (*See, e.g.*, Tr. 330.) According to the testimony of Calderon and C. Martinez, Quijada was becoming a problem for the MS-13 because he "didn't do the work that he was supposed to do." (Tr. 1761; *see also* Tr. 1124; Tr. 1226-27.) When given one more chance to kill a rival gang member, Quijada failed to carry through with what was expected of him as a member of the MS-13. Based on this evidence, a rational jury could have concluded that Martinez felt compelled to punish a member who was not following the rules of the gang in order to instill obedience, as a leader of the MS-13, in the gang's other members. Moreover, C. Martinez testified that when the group was discussing what to do about Quijada after he failed to kill a rival gang member during his mission, Martinez said that they should kill Quijada because he would likely "snitch" on the group if he were arrested. (Tr. 1776 ("And then [Martinez] said that we should kill him back if anything happened, if we had sent [Quijada] to go out and kill somebody and then he was arrested he would actually talk about the gun. . . . He would snitch on all of us.").) A rational conclusion from this evidence is that Martinez's involvement in orchestrating Quijada's murder was motivated by a desire to protect his position in the enterprise – a position that he would lose if Quijada exposed Martinez's identity and criminal behaviors to the police.

Thus, based on the government's evidence at trial, a rational jury could certainly conclude, beyond a reasonable doubt, that at least one reason for Martinez's participation in Quijada's murder was Martinez's desire to maintain or increase his position in the MS-13. Accordingly, Martinez's motion is denied on this ground.

### c. The Murder of Argueta

The charges related to Argueta pertain to her murder, which occurred in the woods of Central Islip, New York, on February 5, 2010.[2]

### i. Summary of the Murder

Cruzito, a member of the CLS clique of the MS-13 (the same clique of which Martinez was a member and leader), was involved in a romantic relationship with Argueta in the beginning of 2010. (Tr. 759-60.) Carla Santos ("Santos"), an associate of

---

[2] Argueta's two-year-old son (Diego Torres) was also murdered on that night in the woods of Central Islip, but Martinez was not charged in connection with the son's murder and no reference to the son's age was made at trial.

the CLS clique, testified that Cruzito and Argueta began having problems when Argueta found out that Cruzito had another girlfriend. (Tr. 760.) Santos testified that, as a result of what she had learned about Cruzito, Argueta sent rival gang members (from the 18th Street gang) to Cruzito's house to beat Cruzito with bats and knives. (*Id.*)

In early February 2010, Cruzito met with members of another clique of the MS-13 – specifically, Gringo and Zorro. Santos was present at that meeting. (Tr. 764.) At that time, the group spoke to Martinez on the phone about the situation with Argueta and rival gang members. (Tr. 765.) Santos testified that, during the various calls the group had with Martinez, there were talks "about how [Argueta] can't just disrespect them like that, like she can't just disrespect Cruzito like that." (Tr. 766.) Santos explained that what the men meant was that Argueta had disrespected Cruzito by taking rival gang members to his home, knowing that he was from another gang. (*Id.*) Santos also testified that, during the group's conversation with Martinez about the situation with Argueta, Martinez told the men to "fix it, to do what they have to do." (Tr. 768.) Edward Heslin ("Heslin"), an FBI agent, testified that, during his interview of Martinez, Martinez indicated that Argueta's murder was motivated by the fact that she had set Cruzito up for an assault by a rival gang member. (Tr. 1065.) Martinez also told Heslin that he had informed Cruzito about where to get the gun that was subsequently used during Argueta's murder. (Tr. 1064-65.) Ralph Rivera ("Rivera"), a detective in the Suffolk County Police Department, testified that Martinez told him, during their interview, that on February 5, 2010, Cruzito and Gringo shot Argueta and Zorro shot Diego, Agueta's son. (Tr. 995.) Rivera also testified that Martinez told him that

"[Argueta] was shot because she had tried to have Cruzito killed a month earlier by the 18th Street Gang." (Tr. 996.)

Santos testified that, on the morning of February 5, 2010, Martinez called her asking for a favor – that she pick up Cruzito from a laundromat in Baldwin, New York. (Tr. 782.) When Santos arrived at the laundromat (with her daughter and Martinez's girlfriend), she was met by Cruzito, Gringo, and Zorro. (Tr. 783.) Zorro asked Santos to take Cruzito to his house, which Santos did. (Tr. 784.) While in the car, Cruzito broke down crying and told Santos that he, Gringo, and Zorro had shot and murdered Argueta. (Tr. 784-85.) After Cruzito met with his mother to say goodbye, Santos drove him to pick up Gringo and Zorro at the laundromat, and then took all three men to Martinez's house in Far Rockaway. (Tr. 786-87.)

Santos testified that she received another telephone call from Martinez the following day, on February 6, 2010. (Tr. 787.) Santos was directed to go to Martinez's apartment. When she got there, she was met by Cruzito, Zorro, and Gringo; Martinez was at work when she arrived. (Tr. 788.) It was Santos' understanding that she was there to help Cruzito, Zorro, and Gringo escape the State of New York, as a result of their involvement in Argueta's murder. (*Id.*) Santos drove the three men to a Greyhound bus station, but the buses were not running due to the inclement weather. (Tr. 789-90.) Santos took them to a motel in Farmingdale, New York, instead, where she reserved a room for them in her name. (Tr. 799-800.)

Santos was called again on February 7, 2010. (Tr. 803.) She went to pick up the men from the hotel and drove them to Martinez's home. Santos was directed to take Zorro, Gringo, and Cruzito to the Bronx because a

van had been arranged to take them out of New York. (Tr. 804.) After she took the men to the Bronx to meet the van, Santos called Martinez to tell him that everything had gone according to plan. (Tr. 805-06.) In regards to Argueta's murder, Martinez told Santos that Argueta had "put herself in that position," and that it "was her fault that this happened." (Tr. 808.) Martinez also asked Santos to send money to Gringo, Zorro, and Cruzito once they arrived in El Salvador, which she did. (Tr. 808-09.) According to Heslin's testimony, Martinez admitted, during his interview, that he "harbored the three assailants involved in the homicide [of Argueta] and hid them in his house while they were arranging to flee the country." (Tr. 1065.)

### ii. Vertical Relatedness under RICO

Martinez does not appear to be challenging the sufficiency of the government's showing of the requisite nexus between the conspiracy to murder and murder of Argueta and the MS-13. However, to the extent that Martinez is challenging vertical relatedness, the government put forth ample evidence at trial, as discussed below, from which a rational jury could conclude that the racketeering acts pertaining to Argueta were related to the MS-13 racketeering enterprise.

Multiple witnesses testified that Argueta's murder was orchestrated because she disrespected Cruzito and, for that matter, the MS-13, by sending rival gang members to Cruzito's home even though she knew about Cruzito's affiliation with the MS-13. (*See* Tr. 766-68 (Santos testifying that the decision to murder Argueta was based upon the fact that she had disrespected Cruzito by taking rival gang members to his home, knowing that he was from another gang); Tr. 996 (Rivera testifying that Martinez told him

that "[Argueta] was shot because she had tried to have Cruzito killed a month earlier by the 18th Street Gang"); Tr. 1065 (Heslin testifying that Martinez indicated that Argueta's murder was motivated by the fact that she had set Cruzito up for an assault by a rival gang member); Tr. 1261-62 (Calderon testifying that Gringo told him that Argueta "had brought over many rival members of the 18th Street gang to kill him" and that, as a result, "[she] deserved it, to die").) All of this witness testimony corroborates the conclusion that Argueta's murder was related to the MS-13 and, more specifically, her perceived disrespect for the gang. Moreover, Santos testified that, before they fled to El Salvador, Zorro, Cruzito, and Gringo gave her some "souvenirs." (Tr. 790.) One of the souvenirs was a dollar bill that the three men signed with their names and their MS-13 clique. (Tr. 793.) The dollar bill also said "MS-13" and had an MS-13 hand sign drawn on the front. (Tr. 797-98.) Across the back of the bill was written "always and forever," as well as "MS-13" and the "ILS Clique," which Santos testified was the former name of the Karlington clique to which Gringo and Zorro belonged. (Tr. 798.) That Zorro, Cruzito, and Gringo signed a "souvenir" with their names, their gang, and their clique within the gang before fleeing the country because of their involvement in the murder of Argueta further supports the conclusion that the murder was carried out in relation to the MS-13 enterprise. Thus, viewing the evidence presented at trial in the light most favorable to the government, as this Court must do on a Rule 29 motion, sufficient evidence was presented from which a rational jury could find that the conspiracy to murder and the murder of Argueta were related to the MS-13 and, accordingly, to the extent Martinez moves for an acquittal on the ground that the government's evidence

of vertical relatedness was insufficient with respect to this murder, his motion is denied.

### iii. Motivation under VICAR

In arguing that the government's evidence at trial was insufficient to establish the requisite motivation under VICAR with respect to Argueta's murder, Martinez first contends that the government failed to prove that he authorized or participated in Argueta's murder. The Court finds this argument to be unavailing, however, based on the substantial evidence presented by the government at trial of Martinez's involvement in the murder of Argueta.

As a preliminary matter, Santos detailed the communication that the three men had with Martinez before murdering Argueta on February 5, 2010. (*See* Tr. 762-68.) She testified that, upon learning about the situation with Argueta, Martinez told Zorro, Cruzito, and Gringo to "fix it, to do what they have to do." (Tr. 768.) In addition, Martinez was the leader of the CLS clique to which Cruzito belonged (*see, e.g.*, 1183-84), and, as discussed *supra*, testimony at trial established that members of the MS-13 report to their leaders for direction with respect to criminal activity (*see, e.g.*, Tr. 806 (Santos testifying that she reported to Martinez, as leader of the CLS clique, about events surrounding Argueta's murder); Tr. 1184). Viewing all of this evidence in the light most favorable to the government, a rational jury could certainly conclude that Argueta's murder was authorized by Martinez.

In addition to the above referenced evidence that Martinez explicitly sanctioned Argueta's murder, an overwhelming amount of evidence presented at trial demonstrates that Martinez in fact participated in the preparation leading up to Argueta's murder.

Specifically, witnesses at trial testified to Martinez's involvement at various stages of the crime: witnesses testified (some based on their personal knowledge of Martinez's involvement and others based on the post-arrest statements that Martinez himself provided) that Martinez (1) took part in preliminary conversations about Cruzito's situation with Argueta and was at least involved in the decision to harm Argueta for sending members of the 18th Street gang to Cruzito's home (Tr. 764-68), and (2) informed Cruzito about where to get the gun that was subsequently used during Argueta's murder (Tr. 1064-65).[3] Thus, the government presented extremely strong evidence – through the statements of witnesses at trial, as well as the defendant's own statements – to establish that Martinez aided and abetted the murder of Argueta.

The Court recognizes that mere participation in a crime is not enough to satisfy the motivation element of the VICAR statute. The government must also establish that the defendant held a position in the criminal enterprise, and that his participation in the racketeering act or acts in question was motivated by a desire to maintain or increase his position in that enterprise. *See Whitten*, 610 F.3d at 178. As noted *supra*, sufficient evidence at trial established that Martinez held a position in the enterprise (as a leader of the CLS clique of the MS-13). In addition, multiple witnesses testified that

---

[3] In connection with the accessory after the fact charge, there was also testimony that Martinez (1) asked Santos to pick up Zorro, Cruzito, and Gringo following their murder of Argueta (Tr. 782); (2) harbored Zorro, Cruzito, and Gringo in his home after he knew that they had committed the murder of Argueta Tr. 1065; (3) helped the three men who committed the murder of Argueta flee the country following their perpetration of the crime (Tr. 788-800; Tr. 803-808); and (4) had money sent to the men who murdered Argueta after they fled the country (Tr. 808-09).

Argueta was deemed to have disrespected Cruzito and the MS-13 by sending members of the 18th Street Gang to Cruzito's home, knowing about the rivalry between the two gangs. (*See* Tr. 766-68 (Santos testifying that the decision to murder Argueta was based upon the fact that she had disrespected Cruzito by taking rival gang members to his home, knowing that he was from another gang); Tr. 996 (Rivera testifying that Martinez told him that "[Argueta] was shot because she had tried to have Cruzito killed a month earlier by the 18th Street Gang"); Tr. 1065 (Heslin testifying that Martinez indicated that Argueta's murder was motivated by the fact that she had set Cruzito up for an assault by a rival gang member).) Calderon explicitly testified that Martinez told him that he believed Argueta deserved to die "[b]ecause she had brought over members of a rival gang to Cruzito's place to kill him." (Tr. 1262.) Santos also testified that she made her actions with respect to the aftermath of Argueta's murder known to Martinez because she was expected to report to Martinez about the events surrounding Argueta's murder, as he was the leader of the CLS clique. (Tr. 806.) Based on the fact that Martinez was a leader of the clique to which Cruzito – the person particularly threatened by Argueta's actions – belonged, and based on the evidence demonstrating that Martinez felt as though Argueta had disrespected his clique and his gang by sending rival gang members to Cruzito's home, a rational jury could conclude that Martinez was motivated to participate in Argueta's murder by a desire to further the MS-13's policy of retaliatory violence against those who offend the gang, in order to promote respect for the gang and to maintain or increase his position in it. *See Tipton*, 90 F.3d at 891. Accordingly, Martinez's motion for an acquittal on this ground is also denied.

***

In sum, viewing the evidence presented at trial in the light most favorable to the government, a rational trier of fact could conclude, beyond a reasonable doubt, that (1) each of the three murders that Martinez participated in was related to the racketeering activities of the MS-13 enterprise, and (2) Martinez's participation in each of those three murders was motivated by a desire to increase or maintain his position in the MS-13. Given the ample showings of relatedness and motive that were made at trial, Martinez has failed to present any grounds for a judgment of acquittal under Rule 29, and his motion is, therefore, denied in its entirety.

### B. Ortega's Motion

Ortega moves for an acquittal, under Rule 29, or, in the alternative, for a new trial, under Rule 33, based on the allegedly insufficient evidence presented by the government at trial with respect to the March 16, 2010 murder of Quijada. Specifically, Ortega argues that the government failed to prove that (1) he conspired to murder or participated in the murder of Quijada; (2) he used a firearm in connection with the murder of Quijada; (3) Quijada's murder was sufficiently related to the activities of the MS-13 (vertical relatedness under RICO); and (4) Ortega's participation in the murder, if any, was motivated by a desire to maintain or increase his position in the MS-13 (the motivation requirement under VICAR).[4] For the reasons

---

[4] The Court notes that, in his motion for acquittal or a new trial, Ortega only explicitly argues that the evidence presented at trial was insufficient to establish that Ortega (1) conspired with others to murder Quijada; (2) was involved in the murder of Quijada; and (3) brandished a firearm during the murder of Quijada. (*See* Ortega Mot. at 2-4.)

discussed *supra* and in detail below, because he has failed to present any grounds for a judgment of acquittal or a new trial, Ortega's motion is denied in its entirety.

### 1. Ortega's Involvement

Ortega claims that the government's evidence was insufficient to support a jury finding that he participated in the conspiracy to murder or the murder of Quijada, arguing that "[t]he trial testimony of the witnesses who were present at the scene of this homicide was that Mr. Ortega was merely present and did not participate in the murder." (Ortega Mot. at 3.) For the reasons discussed in detail below, the Court disagrees with this characterization of the evidence presented at trial.

As discussed in detail *supra*, the evidence at trial demonstrated that Ortega was present during the meeting that was held to discuss Quijada's performance in the gang (Tr. 1220-22), during which it was decided that Quijada would be given one more chance to prove himself to the MS-13 by killing a rival gang member (Tr. 1224; Tr. 1762). Calderon testified that Ortega was one of the MS-13 members who accompanied Quijada on his "mis[i]on," or mission, to seek out and kill a rival gang member. (Tr. 1224-25.) C. Martinez testified that, when the group returned from the mission, "[Ortega] said that he had wanted to give [Quijada] the gun but [Quijada] didn't want to pick it up." (Tr. 1776.) C. Martinez also testified that Ortega told the group that they "had to kill" Quijada. (*Id.*)

However, because Ortega also requests to join in the post-trial motions of co-defendant Martinez, to the extent they are applicable to him (*see id.* at 5), the Court also analyzes the sufficiency of the evidence presented about the Quijada murder with respect to the issues of vertical relatedness under RICO and motivation under VICAR.

Both Calderon and C. Martinez indicated that Ortega was a part of the unanimous decision that was made to pick Quijada up and kill him. (Tr. 1227; Tr. 1776.) Additionally, the evidence demonstrated that Ortega was a part of the group of MS-13 members that left Payaso's house to pick up Quijada and kill him. (Tr. 1239; Tr. 1777.) Based on this evidence of Ortega's (1) participation in discussions about Quijada's failure to perform; (2) pronouncement that Quijada should be killed as a result of his behavior; (3) contribution to the ultimate decision to pick Quijada up and kill him; and (4) involvement in bringing Quijada to the beach to be killed, a rational jury could have concluded that Ortega was a part of a conspiracy to murder Quijada. Accordingly, Ortega's motion for an acquittal on the conspiracy charge related to Quijada's murder is denied.

Moreover, the government presented sufficient evidence to support a jury verdict of guilt as to Ortega's involvement in the murder of Quijada on March 16, 2010. The evidence revealed that four weapons were found at the beach on the night of Quijada's murder (a .22 caliber gun, a machete, a switchblade knife, and a kitchen knife) and that four MS-13 members, including Ortega, were present during Quijada's murder (Ortega, Martinez, Little Lonely, and Payaso). (Tr. 1240 (Calderon testifying that Ortega, Martinez, Payaso, and Little Lonely were on the beach in Far Rockaway during Quijada's murder); Tr. 1777; Tr. 2411.) Based on this evidence and the description of the various injuries to Quijada's body, a rational jury could infer that all four men present during Quijada's murder were involved in his gruesome stabbing. At the very least, a rational jury could conclude that Ortega aided and abetted Quijada's murder that night. Trial testimony established that Ortega was a part of the

group of MS-13 members that left Payaso's house to pick up Quijada on the night of his death (Tr. 1239; Tr. 1777), and subsequently lured Quijada to the beach in Far Rockaway where he was ultimately murdered (Tr. 1239; Tr. 1777-78). Thus, the evidence shows that Ortega "was a part of the planning and preparation for" Quijada's murder, "with the knowledge that [Payaso] was planning on killing" Quijada on the beach. *See United States v. Walker*, 142 F.3d 103, 114 (2d Cir. 1998) (finding evidence sufficient to hold a defendant liable for aiding and abetting murder when the defendant was involved in the planning and preparation of a robbery with the knowledge that another was planning on killing the victim during the robbery). In addition, the government presented evidence that all of the MS-13 members on the beach, including Ortega, "started after [Quijada]" when he began running after the gun that Payaso was pointing at him jammed and he realized that the group meant to kill him (Tr. 1785-86), thereby preventing Quijada's escape. There also was testimony that all of the MS-13 members on the beach, including Ortega, were "supporting" Payaso as he stabbed Quijada with the machete. (Tr. 1241; *see also* Tr. 2412 (Reynaldo Tariche ("Tariche", a Special Agent with the FBI, testifying that, during his interview of Ortega following Ortega's arrest, Ortega told him that he and others were "yelling La Mara, La Mara during the attack" of Quijada).) Finally, evidence was presented that Ortega fled from police that night – specifically, that he and Payaso swam in order to escape to a wooded area once they learned that police had stopped the other members of the group present during Quijada's murder. (Tr. 1787.) C. Martinez testified that Payaso told him that he and Ortega "hid, they went hiding because there was a helicopter overhead looking for them, so they got into the wooded area and they put like a carpet on

top of themselves, and then stayed there for a while." (Tr. 1787-88.) A rational jury could construe this evidence that Ortega hid from police and fled the scene of the crime as "'evidence of consciousness of guilt, and thus of guilt itself.'" *United States v. Steele*, 390 F. App'x 6, 12 n.2 (2d Cir. 2010) (quoting *United States v. Myers*, 550 F.2d 1036, 1059 (5th Cir. 1977)) (explaining that "it is well-settled that flight can, in some circumstances, evidence consciousness of guilt"); *see also United States v. Adeniyi*, 277 F. App'x 22, 24 (2d Cir. 2008) (explaining that evidence of defendant's "coordinated attempt to frustrate law enforcement efforts to arrest [him]" was offered because it evinced a "consciousness of guilt"). Accordingly, for all of these reasons, Ortega's motion for an acquittal is also denied with respect to his conviction on the Quijada murder charge.

Ortega also challenges the sufficiency of the government's evidence pertaining to the charge brought against him for the use or carrying of a firearm in connection with Quijada's murder, in violation of Section 924(c). Ortega argues that "[t]he trial testimony was that Mr. Ortega was not armed at the scene of this homicide, and thus did not support a conviction on this substantive count." (Ortega Mot. at 4.) However, the law in this Circuit is clear that one need not be physically armed at the scene of the crime to be convicted under Section 924(c); a defendant may be convicted as an aider and abetter under Section 924(c) if "he performed some act that directly facilitated or encouraged the use or carrying of a firearm." *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994) (explaining that mere knowledge that a firearm would be used or carried and, with that knowledge, performance of an act to facilitate or encourage the crime itself – as opposed to performance of an act that

directly facilitated the use or carrying of a firearm during that crime – is not enough); *see also United States v. Gunning*, 984 F.2d 1476, 1483 (7th Cir. 1993) (upholding conviction under Section 924(c) because the evidence showed that the defendant actually directed his associate to carry the gun used in the underlying offense).

Multiple witnesses testified that Payaso carried a firearm to the beach on the night of Quijada's murder. (Tr. 1785-86.) Detectives who inspected the crime scene following Quijada's death recovered, amongst other weapons, that firearm – a silver .22 caliber firearm. (Tr. 1292-93.) Tariche also testified that Ortega told him that the group had attempted to use a .22 to shoot Quijada. (Tr. 2412-13.) The government presented evidence demonstrating that the same .22 caliber firearm used in connection with Quijada's murder was in Ortega's possession earlier that evening – namely, that Ortega tried to give the .22 caliber to Quijada to kill a rival gang member, but Quijada would not pick up the gun. (Tr. 1776 (C. Martinez testifying that Ortega told the group at Payaso's house that he tried to give Quijada the gun, but that Quijada would not pick it up); *see also* Tr. 1266 (Calderon testifying that the weapon Quijada was supposed to use to kill a rival gang member during his mission was the .22 caliber firearm).) In addition, C. Martinez testified that Ortega and the other MS-13 members who went to pick up Quijada to take him to the beach where he was murdered spent about ten minutes in the parking lot of a Far Rockaway laundromat before getting Quijada, and that it was his belief that those ten minutes were spent loading the gun that Payaso carried to the beach that night – the same gun that Ortega had tried to give Quijada earlier during the mission to kill a rival gang member. (Tr. 1777-78.) Based on this evidence, a rational

jury could have concluded that Ortega directly facilitated the using and carrying of a firearm in connection with the murder of Quijada by providing the .22 caliber firearm that Payaso carried on the night of Quijada's death to Payaso after Quijada neglected to take it during the mission. Moreover, in addition to providing the firearm, Ortega advocated for Quijada's murder and walked down to the beach with Quijada, Payaso (who was carrying the gun), and the other co-conspirators to ensure that the plan to kill Quijada was successful. *Cf. Medina*, 32 F.3d at 47 ("It could be said that a defendant who is present but unarmed during the commission of a crime may . . . make it easier for another to carry a firearm and therefore aid and abet that act."). Thus, ample evidence was presented at trial from which a rational jury could conclude that Ortega aided and abetted the using and carrying of a firearm during the murder of Quijada and, accordingly, Ortega's motion for an acquittal on that charge is denied.[5]

---

[5] The Court notes that the fact that Payaso never actually discharged the .22 caliber firearm at issue to kill Quijada (because it jammed) does not alter Ortega's conviction under Section 924(c). The law in this Circuit is clear that one may be convicted as an aider and abettor under Section 924(c) for facilitating the use *or* carrying of a firearm during and in relation to any crime of violence. *Medina*, 32 F.3d at 45; *see also* 18 U.S.C. § 924(c). Moreover, a defendant can be convicted of using a firearm even when the gun is not discharged if, for example, the gun was brandished, displayed, or an attempt was made to fire it. *See, e.g., Bailey v. United States*, 516 U.S. 137, 148 (1995) ("The active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm."). The murder of Quijada was accomplished (even without the discharge of the .22 caliber firearm) and Ortega was convicted of the murder. Based on all of the evidence discussed above demonstrating that Ortega facilitated Payaso's carrying of the firearm to the scene of the crime and the attempted discharge of the firearm, Ortega was properly convicted for aiding and abetting the using

In sum, the evidence presented at trial, when viewed in the light most favorable to the government, was sufficient to support the jury's verdict that Ortega participated in the conspiracy to murder and murder of Quijada, and that he aided and abetted the using and carrying of a firearm during the commission of Quijada's murder in violation of Section 924(c). Accordingly, Ortega's motion for a judgment of acquittal based on the allegation that insufficient evidence was presented to support those charges is denied.

## 2. Vertical Relatedness under RICO

As discussed *supra* in the context of Martinez's motion, the government presented overwhelming evidence from which a rational jury could conclude that the conspiracy to murder and the murder of Quijada were related to the activities of the MS-13. Based on the testimony at trial demonstrating that (1) the decision to murder Quijada was made after a unanimous vote of MS-13 members at an MS-13 meeting, and (2) the decision was prompted by Quijada's failure to adequately perform for the MS-13 and to follow the gang's rules and ideals, the government sufficiently established the requisite nexus between the

---

and/or carrying of a firearm during and in relation to a crime of violence (the murder of Quijada) even though the gun was never discharged. Moreover, the Second Circuit has explained that "conspiracy to murder [may also] provide[] the underlying violent felony required for conviction under section 924(c)." *United States v. Persico*, 164 F.3d 796, 803 (2d Cir. 1999). As discussed *supra*, sufficient evidence was presented of a conspiracy to murder Quijada and Ortega's participation in that conspiracy and murder, and that the firearm was used and carried during and in relation to the furtherance of the conspiracy to murder, and murder of, Quijada. In the alternative, the same evidence was sufficient to support a conviction for aiding and abetting the possession of a firearm in furtherance of the murder.

racketeering acts pertaining to Quijada and the racketeering enterprise. Accordingly, like Martinez's motion, Ortega's motion is denied on the grounds of vertical relatedness under RICO.

## 3. Motivation under VICAR

Lastly, Ortega joins in the portion of Martinez's motion that challenges the sufficiency of the evidence of the requisite motivation, under VICAR, for the Quijada murder. Similar to the conclusion reached on this issue in the context of Martinez's motion, the Court concludes that ample evidence was presented at trial to allow a rational jury to conclude that Ortega's participation in Quijada's murder was motivated by a desire to maintain or increase his position in the MS-13.

As a threshold matter, the evidence adduced at trial was sufficient to demonstrate that Ortega held a "position" within the MS-13 enterprise. *Whitten*, 610 F.2d at 178. Sosa testified that Ortega belonged to the STLS clique in El Salvador. (Tr. 371.) C. Martinez also testified that Ortega was an MS-13 member from El Salvador. (Tr. 1765-66 (referring to Ortega as a "homie from El Salvador").) Calderon testified that it was his understanding that Ortega was joining the MS-13 members in their discussions about Quijda's performance and membership in the gang (prior to Quijada's murder) in the United States because Ortega was "a big home boy from El Savador [] coming to do an inspection of the cliques and . . . to see how the SLS clique was being run." (Tr. 1220.) Based on this evidence of Ortega's affiliation with the gang in El Salvador and the role he was playing upon arrival in the United States – inspecting and overseeing gang activity abroad – a rational jury could

conclude that Ortega held a position within the MS-13.

As to the question of whether Ortega was motivated, at least in part, by a desire to maintain or increase his position in the gang when he participated in the murder of Quijada, the government presented sufficient evidence to that effect. As noted *supra*, Calderon testified that it was his understanding that Ortega joined in the discussions about Quijada's performance and membership in the gang because Ortega had been sent, from El Salvador, to inspect how the SLS clique was being run. (Tr. 1220.) At the meeting, it was discussed that Quijada, a member of the SLS clique, was not "running properly," as he "was not doing anything for the Mara and that he only brought problems . . . ." (Tr. 1223-24.) A decision was made to give Quijada one more chance – to give him the opportunity to prove himself to the gang by killing a rival gang member. (Tr. 1224; Tr. 1762.) However, according to the testimony of C. Martinez, Ortega indicated that when he tried to give Quijada a gun during the misson where Quijada was to kill a rival gang member, Quijada did not want to pick it up. (Tr. 1776.) C. Martinez testified that Ortega then proclaimed that they had to kill Quijada. (*Id.*) All of this testimony indicates that Ortega, a valued MS-13 member from El Salvador, was there to inspect the SLS clique – to check on its leadership and the activities of its members – and that, based on the reports of Quijada's prior behavior and his own assessment of Quijada's conduct, he concluded that Quijada had to be murdered for his failure to properly perform according to the rules and ideals of the gang. Indeed, Tariche testified that, during his interview of Ortega following Ortega's arrest, Ortega informed him that "[Quijada] was breaking the rules of La Mara by not putting in work so he had to

go." (Tr. 2411.) Thus, based on all of this evidence presented at trial, a rational jury could certainly conclude that Ortega's participation in the murder of Quijada was motivated, at least in part, by a desire to instill obedience among the gang's members, as well as to promote respect for the gang and his position in it.

\*\*\*

For all of these reasons, viewing the evidence presented at trial in the light most favorable to the government, a rational jury could conclude, beyond a reasonable doubt, that (1) Ortega participated in the murder of Quijada; (2) Ortega aided and abetted the using and carrying of a firearm in connection with the murder of Quijada; (3) Quijada's murder was related to the racketeering activities of the MS-13; and (4) Ortega's participation in the murder of Quijada was motivated by a desire to maintain or increase his position in the MS-13. As such, Ortega has failed to present any grounds for a judgment of acquittal under Rule 29. For the same reasons, Ortega has failed to demonstrate that the sort of "extraordinary circumstances" warranting a new trial exist here, *see McCourty*, 562 F.3d at 475, or that "letting [his] guilty verdict stand would be a manifest injustice," *Ferguson*, 246 F.3d at 134. Accordingly, Ortega's motion for a new trial under Rule 33 is, therefore, also denied.

### III. CONCLUSION

For the reasons set forth above, Martinez's motion for a judgment of acquittal is denied in its entirety, and Ortega's motion for a judgment of acquittal or, in the alternative, a new trial is denied in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: October 24, 2013
       Central Islip, New York

\*       \*       \*

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201 by John Joseph Durham, Raymond A. Tierney, and Carrie Nicole Capwell, Assistant United States Attorneys. Defendant Martinez is represented by Elizabeth E. Macedonio, 42-40 Bell Blvd., Suite 302, Bayside, N.Y. 11361, and Arnold Jay Levine, 11 Park Place, Suite 606, New York, N.Y. 10007. Defendant Ortega is represented by Ira D. London, 99 Park Ave., Suite 1600, New York, N.Y. 10016, and Marianne S. Rantala, 350 Veterans Memorial Highway, Commack, N.Y. 11725.